IN THE UNITED STATES DISTRICT COURT
FOR THE DISTRICT OF KANSAS

PKM STEEL SERVICE, INC.,

    Plaintiff,

vs.     Case No. 04-1299-JTM

STEEL SERVICE CORPORATION, et al.,

    Defendants.

MEMORANDUM AND ORDER

The present action arises from the construction of a large service facility constructed in late 2003 for Cessna Aircraft Company in Wichita, Kansas. The general contractor, The Law Company, Inc., subcontracted with defendant, Steel Service Corporation, for the fabrication and erection of the structural and miscellaneous steel and metal deck for Cessna's 458,400 square feet C-10 Citation Service Center facility. The new Service Center includes a three-story central office area, and five adjoining aircraft hangars and shops. The Service Center was built with a concrete slab on grade, structural steel framing system, and exterior metal siding, and an EPDM flat roofing system.

Steel Service contracted with plaintiff, PKM Steel Service, Inc., to supply some of the structural steel. However, delays arose in the erection of the structural steel, and Steel Service was subjected to backcharges from Steel Service's erection subcontractor, Williams and Beasley (later named Bosworth Steel Erectors), and allegations of delay by the general contractor Law.

PKM sued Steel Service and Law and their sureties for nonpayment. Steel Service counterclaimed, arguing that the delays arose from the plaintiff PKM's late deliveries. Steel Service

also cross-claimed against Law and its sureties for nonpayment. Before trial, Steel Service settled with Bosworth and with Law, and now seeks recovery for the amount paid to settle Bosworth's erection delay claim.

The matter came on for trial beginning January 30, 2007, the matter being submitted to the court. The court heard some seven days worth of testimony and received several hundred exhibits detailing the history of the construction of the Cessna Service Center. The court also permitted the parties an extended opportunity to submit post-trial arguments and suggested findings, which they now have done. The court has reviewed the trial testimony, the exhibits, and the submissions of the parties, and now enters the following findings of fact and conclusions of law.

**1. Findings of Fact**

The court makes the following findings of fact. To the extent findings requested by a party are not included here, this reflects a determination by the court that the requested findings were either not material to the resolution of the action, or were not credible based upon the court's assessment of the veracity of the witnesses and the circumstances of the case.

The essence of PKM's case is that any delays it encountered in producing finished structural steel elements were caused by Steel Service delays in producing shop drawings and other items necessary for it to commence work. In other words, PKM claims that to the extent it caused delays, Steel Service caused PKM's delays, and that Steel Service, not PKM, should be held responsible. PKM contends that only a narrow window existed in its schedule for the production of the work. The court generally finds that this contention is not persuasive in light of the credible testimony of the witnesses for defendant and the circumstances of the case.

On August 8, 2003, Jim Simonson of Steel Service and Tim Wolf of PKM entered into an agreement under which PKM would fabricate 22 of the Service Center's hangar roof trusses. PKM would be paid $320,000 for its work on the trusses, which would weigh some 580 tons. The fabrication would be based on "mill materials, painting and shop drawings" provided by Steel Service (Ex. 428). Each truss would require about four weeks of work for fabrication.

The parties entered into a lump sum contract, under which Steel Service agreed to pay PKM a total of $320,000 for the specified Cessna truss sequences. The contract provided that, if Steel Service had PKM supply additional trusses (which did not occur), it would pay $550.00 per ton for those additional trusses. The purchase order expressly states that it is for a "[t]otal lump sum [of] $320,000." (Def. Exh. 430).

The lump sum nature of the contract is also implicit in the contract itself — specifying that a unit price ($550 per ton) for the (hypothetical) additional trusses, but a specific sum ($320,000) for the Cessna project, consisting of "22 wide flange trusses, *approximately* 580 tons, as further described in the attached spread sheet, F.O.B. job site Wichita, KS." (Id.) (emphasis added). The contract for the scheduled truss work was for a specific lump sum. It noted that the actual weight of that work was an estimate and would not control the price for the work.

This understanding of the contract is confirmed by the nature of the August 8, 2003, discussions which led up to the purchase order, and by the Approval Letter sent by Steel Service to PKM on August 8. (Def. Exh. 428). That PKM knew the contract was for a lump sum is further recognized in PKM's internal project summary reports, which note the Cessna project as "LS" in the box coded for "U.P./L.S.," meaning lump sum rather than unit price. (Def. Exh. 631).

The contract did not require Steel Service to provide PKM with "mult lists" (itemizations of the necessary work) as part of the contract. However, Steel Service provided mult lists to PKM as a means of expediting the work. The testimony at trial established that the mult lists were not essential to PKM commencing work, and PKM could have started on the truss sequences without them. The court notes the admission by Jeremy Ingram and Michael Callahan on cross that they could not identify any actions of Steel Service which caused the delays in PKM's production. As discussed herein, the issue of mult lists is not material. The evidence establishes that by September 2, 2003, PKM had everything it needed to begin work.

Schedules for the project were provided in Steel Service's previous (August 6) request for proposal and in Steel Service's later transmittal of the purchase order (August 11), but the parties did not intend that these schedules should control. The parties did not reach any agreement at all until August 8, and the latter purchase order transmittal also reflected explicitly an expectation that materials would not be supplied until August 13. PKM never actually planned to start its fabrication prior to August 14. The original schedule proposed (with deliveries from August 19) during the parties' earlier negotiations had been superseded by events and was not intended as controlling at the time of the purchase order agreement. The schedule that would be adopted and agreed to by the parties was that reflected in the September 2 "Verification of delivery dates" communication by PKM.

Between August 14 and August 26, Steel Service (and its mill supplier Nucor) sent 63 truckloads of materials to PKM. All of these oversize shipments required special escorts and could travel only in daylight during the two-day trip. Nucor delivered one load on August 14, ten loads on August 15, eight loads on August 16, and five loads on August 17. Steel Service delivered three

loads on August 16, four loads on August 19, eleven loads on August 20, five loads on August 21, nine loads on August 22, four loads on August 23, two loads on August 25, and two loads on August 26.

PKM argues that the materials delivered to it were late and were out of sequence. The court finds that these arguments are without substance. PKM did not timely make any complaints about delays, with specific exceptions (Sequences 33-35) for which Steel Service correspondingly extended PKM's return delivery schedule, and made no contemporaneous complaints at all about out-of-sequence delivery. The delays in delivery (which commenced on August 14) were in any event material, given the necessary delays in shipping such a large amount of material and the explicit statement in the purchase transmittal order that Steel Service at most hoped to have materials "coming to you" by August 13. (Exh. 430).

On August 21, Steel Service sent PKM a "revised" schedule, which recognized PKM's request for additional time for the first three sequences because of late deliveries of steel.

On September 2, Jeremy Ingram, PKM's project manager, explicitly "verified" the August 21 revised delivery dates (September 12 - November 10) and that seven of the total of fourteen sequences could proceed with fabrication. Ingram's e-mail confirmed that all of the materials, shop drawings and mult lists had been received for those seven sequences prior to September 2, that another sequence had all shop drawings and mult lists and 98% of the materials, and that PKM had about 30 days to fabricate each sequence from receipt of all deliverables.

The following day, PKM returned the executed purchase order to Steel Service with its revisions and with no complaints.

The purchase order provided that "[t]his transaction and all its terms shall be construed in accordance with and all disputes shall be governed by the State of Mississippi." (Exh. 436, at ¶ 20(h)). The purchase order also provided that, in the event of litigation, the prevailing party had a right to recover attorney fees, expenses, and costs. (Id. at ¶ 10(j)).

Paragraph 10 of the signed purchase order (with PKM's added and revised language shown here in italics) addressed the Cessna project's schedule:

> *After VENDOR approves changes to the schedule*, *the* VENDOR agrees to be bound by, and to perform its Work in accordance with the updated project schedule as it may be changed from time to time, and to cooperate with STEEL SERVICE and all others on the project, in accordance with the various completion dates and milestones. VENDOR's delivery after the specified date shall constitute a material breach of this order and VENDOR is liable for all damages incurred by STEEL SERVICE as a result of such delay, unless such delay is an excusable delay under the Contract Documents and STEEL SERVICE is granted a time extension.

(Exh. 436, at ¶ 10). As noted earlier, the schedule that was agreed to and binding on the parties was that set forth in the September 2, 2003 "Verification" e-mail communication sent by PKM's project manager to Mark Aurand of Steel Service.

The same "Verification" e-mail showed that as of that date, PKM then had 100% of the required materials for the truss work for seven of the first fourteen truss sequences (Sequences 33, 34, 7, 35, 8, 36, and 9), and 98% of another sequence (Sequence 10).[1]

Aurand visited PKM's shop and met Jeremy Ingram for the first time on September 10. During the visit, Ingram expressed no complaints, and they discussed PKM's fabrication of additional trusses.

---

[1] The Sequence Numbers of the trusses do not derive from the order in which they were to be delivered and erected at the construction site.

6

PKM's arguments relating to delays and a lost "fabrication window" beginning August 15 are belied by its subsequent agreement to the September 2 schedule and the conversations between Aurand and Ingram on September 10, during which PKM not only did not complain about any lost window, but discussed adding trusses to the existing work. The actual project documents and the testimony of the witnesses do not support a conclusion that there was a fabrication window which had to be moved back because of anything which Steel Service did.

The court finds that the September 2 schedule is the parties' "updated project schedule" referred to in Paragraph 10 of the purchase order, which bound both parties. The evidence at trial established that neither PKM nor Steel Service believed the original purchase order schedule was controlling.

On September 11, Steel Service sent PKM a revised schedule which did not change the schedule for six sequences, relaxed the truss delivery dates for another six sequences by 3-4 days, and moved up the last two sequences by 5-6 days. Ingram's job summary report completed the next day confirmed that PKM then had all deliverables (materials, shop drawings, mult lists) for eleven of the fourteen truss sequences, and that another sequence had 98% of deliverables complete. The same report showed that at that time PKM had succeeded in fabricating 100% of the first sequence (Sequence 33) and 49% of the second sequence (Sequence 34).

Under the September 2 schedule, these two sequences were to be delivered by PKM on September 12 and 19, respectively. However, even though Sequence 33 was fully fabricated on September 11, it was not delivered until five days later. Similarly, while Sequence 34 was almost half finished on September 11 and was scheduled for delivery on September 19, the Sequence was not delivered until September 19 and September 22.

Steel Service advances no claims for any delays in these first two sequences. Any delays prior to September 26 did not create any actual delays at the construction site because of rain and other job site conditions.

However, the delays in the delivery of the subsequent truss sequences were more substantially delayed. In fact, PKM did not meet any of the delivery deadlines for the subsequent truss sequences. There is no credible evidence showing that Steel Service caused or induced these material delays in delivery.

The court finds instead, based upon its assessment of the circumstances of the case and the credibility of the witnesses, that the true cause for the delay in the production of these truss sequences was a lack of certified welders actually used in the one PKM plant bay which could accommodate the Cessna trusses, coupled with PKM's decision to give priority to work other than the Cessna trusses, specifically to work known as the Brunswick project, thereby delaying the Cessna work given the limited shop resources at PKM.

By September 10, PKM had everything it needed (all materials, mult lists, and shop drawings) for half of the truss sequences, and 98% of the materials for another sequence. Yet, at that time, it had then incurred only 2289 man hours on the project, even though it had planned to have expended 3731 hours by then, and estimated that it would take a doubling of man hours to finish the job. (Exh. 77).

The court's conclusion with respect to the Brunswick project arises from the failure of PKM to supply documentation regarding the mysterious Brunswick project (PKM states that all of the documentation surrounding the project was destroyed), the doubtful testimony of PKM chief operating officer Dennis Randle who stated that he could not remember the Brunswick project, and

the failure of PKM to supply the testimony of other plant officers who should recall such an important project. It also follows as well from the internal PKM e-mail sent by PKM plant manager Mike Wineteer on September 15.

> In that e-mail, Wineteer wrote:
>
> For the past four weeks, PKM's East Shop has been able to fabricate 12 truss sections, which equates to an average of 3 sections per week. There is a total of 65 sections required for this project. At this time, we are approximately 18.46% complete.
>
> The primary effort of this truss fabrication has been performed in Bob Frenzl's New Bay; however, several West Shop welders assisted in prepping the web-member beams for 9 of the twelve truss sections, completed thus far.
>
> At this time, the Production plan is to pull all assembly labor off of the Cessna C-10 project, and concentrate our truss-building efforts toward the 33 truss sections required for sequences 15, 17, 19 and 21 on Brunswick. Brunswick trusses will require 3 weeks of fabrication time, which will leave the Cessna project at a stand still until the beginning of the week of Oct. 6.
>
> I believe that we will then be able to concentrate the efforts of Frenzl's entire crew, as well as two of Melvin's crews, in order to boost our truss production on Cessna. This increase of man power will equate to a 67% increase over our past 4-week average of 3 truss sections per week.
>
> Even with this substantial increase in truss production, PKM will not be able to deliver the last truss load to Wichita until December 19, (53 trusses divided by 5 trusses per week = 11 weeks; only 4 trusses for week of Nov. 24, if we work three 12-hour days?).

(Plf. Exh. 77).

This e-mail is important not merely because it documents the already substantial delays that were accumulating in the Cessna project ("Brunswick trusses will require three weeks of fabrication time, which will leave the Cessna project at a standstill until the beginning of the week of October"), but for what it explicitly and implicitly says as to the reasons for those delays. The e-mail

9

acknowledges that PKM planned to stop working on the Cessna project in order to focus on Brunswick. Wineteer makes no suggestion in the e-mail that the delay is the product of insufficient delivery of materials or plans by Steel Service. Rather, the essence of the e-mail is Wineteer's attempt to balance PKM's "assembly labor" on its various projects, given "the number of man hours available." Thus, Wineteer discusses the contribution of one foreperson's "entire crew," and another's "crews," along with "assist[ance]" from "several West Shop welders."

The delay in the construction of the Cessna project was created by the limited number of welders operating in the PKM shop, as observed (in an October 16, 2003 visit) and credibly testified to by Jim Simonson of Steel Service, and by the defendant's expert Ray Vinson. That the delay was caused by preferring Brunswick to Cessna is confirmed by PKM's man-hour records. This preference ultimately meant that work on the Cessna project could not begin until October 6, and would not be completed until December 19.

Nor is PKM at all persuasive in its suggestion that its plant manager's e-mail is merely some meaningless theoretical thinking by a person without decision-making authority. The same final delivery date — December 19 — is also used in the job summary report Ingram adopted four days after the e-mail. The court finds that the September 15 e-mail accurately reflects a plan adopted by PKM to delay production on the Cessna work. Further undermining the credibility of PKM's argument is its failure to call Wineteer, its own plant manager, to testify about the meaning of the e-mail.

On September 17, Ingram of PKM sent an e-mail to Steel Service which included a revised schedule with substantial delays. This schedule was largely modeled on the September 15 proposals of Wineteer. In the new e-mail, the putative reason for the greater delays was a delay in receiving

10

materials from Steel Service. However, the court finds that this was not the true reason for the new, material delays. First, as a general matter based upon its observation of the testimony, the court finds the PKM witnesses on the issue are generally lacking in credibility. Second, the court notes that the same (relatively minor) delays in shipping by Steel Service in August had been previously cited by PKM, and served as a basis for the revised, September 2 schedule. The same August delays should not have required a further, and far more drastic, schedule revision later in September. Further, as noted earlier, the documentary evidence shows that many of the sequences had been fully supplied by Steel Service to PKM. And PKM made no attempt to warn or inform Steel Service's Mark Aurand of these supposedly serious deficiencies when he had personally visited the PKM plant on September 10. Instead, at the time, PKM told Aurand that it was willing to work on more trusses.

Steel Service was surprised by the delays reflected in the September 17 message, and objected to them. It also began to discover that some of the work done by PKM on the trusses was defective and required repair by the erector Bosworth. Bosworth consequently charged Steel Service $12,997.50 for overtime labor and $136,935.00 in contract delay charges. Bosworth's invoice was later increased to $441,784.36, but ultimately settled by Steel Service for $180,500. In October, Steel Service was forced to hire Griffith Steel Erection, Inc., to repair the PKM trusses.

Most of the PKM trusses were delivered only after substantial delays —

| Truss Sequence | Days Late |
| --- | --- |
| 34 | 3 |
| 35 | 14 |
| 36 | 19 |
| 37 | 24 |
| 38 | 22 |
| 46 | 11 |
| 47 | 15 |
| 7 | 11 |

| | |
|---|---|
| 8  | 17 |
| 9  | 21 |
| 10 | 28 |
| 11 | 25 |
| 12 | 16 |

These delays would cause significant costs to the project, as the truss erector Bosworth was required for architectural and engineering reasons to erect each truss sequence in a prescribed order. While there had been some minor delays in the Cessna project for other reasons such as the weather, John Bosworth credibly testified that his company could have made up for these and remained on schedule but for the continuing delays with the delivery of trusses from PKM, even allowing for the need to "infill" or repair or alter the defective PKM trusses after their arrival. The delays in the erection of the steel trusses were caused by PKM's late deliveries of truss sequences..

On September 26, the general contractor Law wrote to Steel Service to state that "the Owner and the Architect are threatening to shut down the steel operations due to untimely resolution of deficiencies." (Exh. 458). These deficiencies included defects in the PKM trusses, and Steel Service was forced to have an engineer (Terracon) investigate and report on the already installed trusses in order to convince the project engineer that the trusses could be repaired without having to be taken down.

The delays which Steel Service was forced to endure was the product of the unjustified delays by PKM. That the delays were caused by PKM is further corroborated by the repeated communications from Steel Service to PKM, stating that it would hold PKM liable for the costs of the delays, and the corresponding failure of PKM to contemporaneously object or challenge such statements. While subsequently PKM has cited the addition of stiffener plates to the delivered trusses as a rationale for delays, the court finds that the stiffener plates did not actually cause any of

the truss delivery delays, and the matter is relevant only in assessing the appropriate costs for the repairs of the trusses. PKM is liable for the damages sustained by Steel Service in the late delivery of the trusses and the expenses it incurred in correcting the truss defects. The court finds that (with the exception of the minor omission of certain stiffener plates) the defects in the PKM products were substantial, and that Griffith's charges for repair were reasonable.

The court finds that PKM may be reasonably charged with the expenses incurred by Steel Service when it employed another company, Hillsdale Steel, to fabricate trusses which PKM indicated it could not produce. The Hillsdale charges are reflected in Steel Service Change Order Number 1. PKM agrees that some charges are appropriate for the Hillsdale work, but challenges the actual amount cited by Steel Service as excessive. The court finds that the charged amount is reasonable.

Under Paragraph 16 of the purchase order, if PKM could not finish all the work in a timely fashion, Steel Service had the right to procure completion of the project by other venders, charging PKM for the work. PKM knew it could not finish all the Cessna work and had itself intended to contract with Hillsdale, but the company would not contract directly with PKM. PKM's material breach of the schedule adopted under the purchase order contract justified Steel Services' turning to Hillsdale for assistance. PKM is also responsible for that portion of the erector Bosworth's charges for the delay in the delivery of the Hillsdale trusses, since PKM had caused delay by erroneously sending the first truss — rather than the second — in Sequence 8, as PKM had previously led Steel Service to understand.

Contrary to the arguments of PKM, the court finds that the Simonson's testimony establishes that the Griffith repair charges reflected in the change orders do not contain charges for repairing any

of the Hillsdale trusses. PKM does not dispute that some $42,457.45 of the charges by Bosworth and Griffith were reasonable.

The court also finds that the Bosworth charges reflected in defendant's Supplemented Exhibit 632 are reasonable. PKM failed to provide any convincing evidence during the trial that the charges, including those for overhead and profit, are inappropriate, and the court finds persuasive and credible the evidence supplied by Steel Service that the charges were necessary and are reasonable under the circumstances of the case. For example, Mark Aurand testified credibly that the overtime work by Bosworth was necessary to help keep the project close to the schedule.

In addition to the overtime and other charges, the court also finds specifically that Steel Service is entitled to claim as damages the $180,500 which it paid as a reasonable settlement of the Bosworth claim. (Bosworth at one time claimed some $441,784.36 in charges against Steel Service for delays in general to the project.) The Bosworth claim arose primarily because of the delays which began to accumulate after September 26, delays attributable to PKM's unjustified failure to deliver trusses and the need to rework the delivered trusses. From the testimony of Jim Simonson, John Bosworth, Ray Vinson, and Mark Aurand, the court finds that the charge is reasonable given the circumstances of the case. The court finds John Bosworth's testimony particularly credible that the $180,500 reflects charges attributable solely to PKM's delays.

The court also finds credible the testimony of the expert, Ray Vinson. Vinson's testimony establishes that the steel erection at the Cessna Service Center was delayed for 27 days due to PKM's action, thereby causing substantial expenses and costs to Bosworth. The court finds Vinson's testimony consistent, convincing, and credible.

In contrast, the court finds the testimony of the expert witness, Michael Callahan, of very limited utility. Callahan is a recognized author on the subject of assessing the causes of construction delay, but the court concludes that his helpfulness here was severely limited by his deviation from the procedures set forth in his own treatise, as well as his dubious attempt to maintain that PKM's explicit "Verification" e-mail of September 2, 2003 had no binding effect on the parties.

PKM did not submit any independent evidence that the Bosworth charge is unreasonable, other than soliciting additional testimony from its production project manager, Jeremy Ingram. The court finds that Ingram's value as a witness in this respect is limited, since he does not have any clear education, experience, or expertise in accounting or the auditing of construction records. The court finds no basis for discounting or disqualifying any particular charges assessed by Bosworth, and rejects the various speculations offered by PKM suggesting that the charge could be excessive. Although there were some other delays associated with the project, Bosworth implemented a recovery schedule which could have kept the completion of project to the schedule in the absence of the lengthy delays caused by PKM.

The court finds that the $180,500 paid to settle the Bosworth claim was a reasonable charge for PKM's delays, and was a reasonable expense incurred by Steel Service in settling the claims arising from those delays. PKM points out that at one time Bosworth offered to settle the claim for $136,000. However, the court finds that Steel Service, then facing multiple claims by a variety of parties including PKM, Law, and Bosworth (which as noted earlier was seeking a total of $441,784.36 in damages), and did not act unreasonably in seeking further information rather than accepting the settlement. As noted earlier, the court finds that the ultimate settlement accurately reflects the reasonable costs arising from PKM's delays.

Because of the substantial expenses incurred by Steel Service in mitigating the effects of the PKM delays, the defendant was justified in withholding payment from PKM.

PKM argues that Steel Service knew the actual weight of the work exceeded the stated weight. However, PKM supplied no proof of this speculation at trial. Further, PKM had its own records from which it could have independently determined the approximate weight of the steel work to be completed. PKM freely contracted with Steel Service for the provision of the steel truss work in exchange for a given lump sum payment, and the court will not remake the contract now. Accordingly, PKM's attempt to recover additional costs (for shipping, delivery, and labor) due to the allegedly increased weight are without merit. Further, because the loads were shipped by truss section rather than by weight, the request for additional shipping is contrary to the evidence. Nor was the nature of the additional labor ever credibly articulated by any PKM witness.

PKM also states that some of the delays were the responsibility of Hillsdale trusses, and that it is not responsible for such charges. However, Paragraph 16 of the purchase order agreement provides:

> Remedies. At STEEL SERVICE's option, VENDOR will repair or replace any nonconforming Work at its expense. If VENDOR does not replace or correct defects in any nonconforming Work promptly, or fails to deliver all or a portion of the Work within the time required, STEEL SERVICE, after 3 work days' written notice to VENDOR, may make such corrections or replace the Work and charge VENDOR for the costs incurred by STEEL SERVICE or CONTRACTOR. VENDOR shall be liable to STEEL SERVICE to the extent the cost of such replacement Work exceeds the price specified in this Purchase Order, and for any additional charges incurred by STEEL SERVICE in connection with the replacement Work. In such case, VENDOR shall immediately return to STEEL SERVICE any overpayment received with respect to the Work, and shall reimburse STEEL SERVICE for any costs. VENDOR agrees that it shall be liable for any delays caused by it and that the actual and liquidated damage provisions of the Contract shall be enforceable and collectable by STEEL SERVICE against VENDOR and that STEEL SERVICE can offset from sums otherwise due VENDOR an amount equal to such damages that result from the

>failure of VENDOR to perform its Work properly, timely or in accordance with this Purchase Order.

Steel Service gave PKM the notice required by this paragraph, and is liable for any costs experienced by Steel Service in its attempt to obtain replacement work.

PKM's attempt to recover $39,177.00 for freight costs and for prepping materials that were sent to Hillsdale is unsupported in the evidence. PKM failed to provide labor records supporting such a claim, even after Hillsdale explicitly responded by stating that PKM had actually done only $3,619.00 in work on the material shipped to it. PKM never gave any itemization of its larger claim to either Hillsdale or Steel Service, and the court finds no basis for it now. The court will allow PKM recovery in the amount of $3,619.00 for the amount which the evidence confirms was reasonably necessary for PKM to ship the Hillsdale trusses.

By stipulation, it was established that if the court were to find Steel Service was liable to PKM, then the sureties, St. Paul and USF&G, would be liable to PKM in accordance with and to the extent of the terms of each of the payment bonds.

## 2. Conclusions of Law

The court's conclusions of law follow directly from the findings of fact set forth above. In Mississippi, as elsewhere, the elements of a breach of contract claim are proof of (1) the existence of a valid contract; (2) a material breach by one of the contracting parties of its contractual obligations; and (3) damages proximately caused by the breach. *Matheney v. McCain*, 161 So. 2d 516 (Miss. 1964). Here, both parties agree there was a valid contract; they dispute who breached the

agreement. The questions before the court are whether there was a breach by one or more of the parties, and what are the damages arising from the breach.

The court has little difficulty in light of the facts in concluding that PKM, not Steel Service, materially breached the agreement. The rationales for the delays offered by PKM are *post hoc* attempts to rationalize its own breach. As indicated in the findings of fact, the court finds that PKM has seized on insubstantial delays in Steel Service's actions as a justification for the far longer delays caused by PKM's actions. The evidence establishes that any delays by Steel Service were very short, and did not cause the substantial delays in trust fabrication by PKM. Further, those delays had already been factored into the revised schedule which was entered into by the parties on September 2, 2003. They cannot justify the subsequent, damaging delays in the delivery of the trusses by PKM.

The court finds that damages may be appropriately awarded to Steel Service consistent with the following itemization:

| | |
|---|---:|
| Base Purchase Order | $ 320,000.00 |
| Change Order #1 | (102,119.00) |
| Change Order #2 | (88,381.00) |
| Change Order #3 | 6,680.55 |
| Change Order #4 | (17,542.25) |
| Griffith Ticket Adjustments | 4,266.00 |
| Bosworth Ticket Adjustments | 1,474.50 |
| Bosworth Delay Settlement | (180,500.00) |
| Credit for PKM truss sections prep | 3,619.00 |
| Terracon re-inspection costs | (11,981.82) |
| D&D Equipment lift rental | (3,300.00) |
| | $ (67,784.02) |

(See Suppl. Exh. 632).  The court finds that Steel Service suffered damages proximately caused by PKM's breach in  the amount of $67,784.02, and accordingly will enter judgment in favor of Steel Service in that amount.

The court denies any claim by PKM that Steel Service materially breached the agreement. The court specifically finds that PKM is not entitled to any award of prejudgment interest on the withheld purchase order payment, since an award of prejudgment interest is not appropriate under Mississippi law where, as here, the denial of the claimed amount due is premised on a dispute arising in good faith and based upon good cause, rather than frivolously or in bad faith.  *See Aetna Casualty & Surety Company v. Doleac Electric Company, Inc.*, 471 So. 2d 325, 331 (Miss. 1985).  Here, given PKM's material breach of the agreement and the consequent claims against Steel Service by other contractors — claims which the purchase order provided could be charged back to PKM — the amount due PKM was in doubt and the subject of a legitimate dispute.

The parties' purchase order, Paragraph 20(j), provides that the prevailing party is entitled to recover attorneys' fees, expenses, and costs.  The court finds that Steel Service is entitled to recover its attorneys' fees, expenses, and costs, to the extent that they are reasonable and are documented in subsequent pleadings presented to the court.

IT IS ACCORDINGLY ORDERED this day of May, 2007, that the plaintiff PKM's claims for relief are denied; the defendant Steel Service will be granted judgment in the amount of $67,784.02, and will be further awarded its reasonable attorney fees, costs, and expenses.

IT IS FURTHER ORDERED that, although attorney fees are not statutory in this case, the parties are to follow the procedures set forth in D.Kan.Rule 54.2 in seeking attorney fees and expenses, and D.Kan.Rule 54.1 in seeking costs.

                                                                     s/ J. Thomas Marten
                                                                     J. THOMAS MARTEN, JUDGE